# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STILLWATER LTD., A United Kingdom Company<br><br>　　　Plaintiff/Counter-Defendant,<br><br>　　　v.<br><br>ANTONIA BASILOTTA, p/k/a TONI BASIL, an individual,<br><br>　　　Defendant/Counter-Claimant. | CASE NO: 2:16-cv-01895-SK<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I.
## <u>INTRODUCTION</u>

On December 9 and 10, 2019, the Court held a bench trial on Plaintiff Stillwater Ltd.'s declaratory judgment action against Defendant Antonia Basilotta ("Toni Basil"). Stillwater seeks a declaratory judgment on its two remaining claims.[1] First, it seeks a declaration about the percentage of the copyrights in the Disputed Sound Recordings[2] (the "DSRs") that reverted to Basil as a result of a notice of termination that she served under 17 U.S.C. § 203(a) in March 2013. Stillwater argues that the DSRs are a joint work

---

[1] After the close of evidence in its case, Stillwater abandoned its third claim for declaratory relief over the *Best of Toni Basil* compilation album.

[2] The DSRs are for ten songs, all of which are embodied in the *Word of Mouth* record album released in the United States: "Mickey," "You Gotta Problem," "Be Stiff," "Space Girls," "Nobody," "Thief on the Loose," "Little Red Book," "Time after Time," "Rock On," and "Shoppin' From A to Z".

under the Copyright Act, thereby limiting Basil's reverted copyright interest in them to the percentage of her contribution as a coauthor of the joint work.  Second, Stillwater seeks a declaration that Basil's § 203(a) notice is ineffective for a pair of disputed recordings—"Mickey Club Mix" and "Mickey Spanish Version" (the "Mix and Spanish Recordings" or "MSRs")—because they are derivative works not subject to termination under § 203(a).

In accordance with Federal Rule of Civil Procedure 52(a), the Court concludes based on the material facts outlined below that:  (1) Stillwater has not met its burden to prove by a preponderance of the evidence that the DSRs constitute a "joint work" under the Copyright Act; but (2) Stillwater has met its burden to prove by a preponderance of the evidence that the MSRs are "derivative works" not subject to termination under § 203(a).  For these reasons, judgment will be entered in Basil's favor on Stillwater's first claim for declaratory relief, and in Stillwater's favor on its second claim for declaratory relief.

## II.
## FACTUAL FINDINGS

To arrive at its material findings of fact, the Court considered all the testimony and evidence adduced at trial, which includes the Court's first-hand evaluation of the credibility of the only two witnesses who testified, Simon Lait and Toni Basil.  Much of Stillwater's case depends on the competing accounts between these two witnesses of events that happened long ago and their intentions at the time.  So among the factors the Court considered in its credibility determinations were the overall demeanor of these two witnesses when answering questions, their apparent frankness or evasiveness when asked specific adverse questions on key topics, the likely

accuracies of competing recollections of events given the considerable lapse of time, the witnesses' relative motives to tell the truth, their pecuniary interests in the outcome of the case, and any subtle but non-trivial gaps or inconsistencies in their competing accounts exposed under cross-examination.  Based on these considerations, the Court found that Basil's testimony was, on balance, marginally more credible than Lait's testimony, and so any finding below based on Basil's testimony takes that credibility assessment into account.

In addition, to the extent that the District Judge previously assigned to this case made any material findings of fact, those facts are accepted here as the District Judge found.  And the parties' stipulations or concessions in their Memoranda of Contentions of Fact and Law, the final Pretrial Conference Order, or related pleadings are considered binding admissions.

With that background, the Court finds that:

1.     Between 1979 and 1982, Toni Basil entered into written agreements with Radialchoice Ltd., a UK recording company formed by Lait in 1979, as a result of which Basil's copyright interests in the DSRs and MSRs were granted and transferred to Radialchoice.  (*See also* ECF 89 (Order Re: Renewed Cross Motions for Summary Judgment)).  The parties agree that the DSRs were not created as "works for hire," that there was no work-for-hire agreement between Radialchoice and Basil, and that Basil was never a Radialchoice employee.  (ECF 96 at 6-7; ECF 155 at 3).

2.     Through a series of written and oral assignments, Radialchoice's copyright ownership of the DSRs and MSRs was eventually transferred to Stillwater.  (*See* ECF 89 at 13 ("Stillwater has shown title of

ownership for purposes of standing.")).[3]

3. In March 2013, Basil served a notice of termination-reversion of copyright under 17 U.S.C. § 203(a) for the DSRs and the MSRs. Stillwater received this notice. The notice stated that the copyrights in the DSRs would revert to Basil as of June 11, 2016.

4. Lait formed Radialchoice to develop and embark on a new musical concept—albums containing music videos instead of just sound recordings. To that end, Lait sought visually literate artists to create not only sound recordings but also accompanying music videos to be released in album format. Lait met Basil sometime in 1979. Lait thought Basil was the type of visually literate artist he was looking for. So he asked her to sign with Radialchoice, and Basil agreed to record three songs to start.

5. As it turned out, Radialchoice produced and released two record albums with Toni Basil: *Word of Mouth* and the eponymously titled *Toni Basil*. The *Word of Mouth* record album, consistent with Lait's vision, was also turned into one of the first music video albums featuring combined audio and visual performances. The visual performances for the separate music video album (which is not in dispute here) was conceived, choreographed, directed, and edited by Toni Basil using the sound recordings from the *Word of Mouth* record album.

6. Radialchoice and Basil executed an agreement dated August 31, 1979. The 1979 Agreement said that if any master recording was not of a satisfactory technical standard, Radialchoice could require Basil to re-record it. The parties, however, agreed to strike out language that would

---

[3] If Stillwater were not the ultimate successor-in-interest to Radialchoice's ownership interests, there would be no current legal relationship between Stillwater and Basil for Basil's accounting counterclaim against Stillwater.

have given Radialchoice a say in whether a recording also met a satisfactory "artistic" standard.  Otherwise, the agreement required Radialchoice to finance studio musicians, producers, and other costs in making the recordings, which Radialchoice did.  And it required Radialchoice to pay a non-returnable advance of $7,500 to Basil, which it also did.

7. Basil picked the first three songs to be produced by Radialchoice and also selected many of the instrumental musicians for those songs.  Lait approved of her choices.  Basil was to be the vocal soloist for the three songs.  Radialchoice and Basil also agreed upon Greg Mathieson to be the music producer for the first three songs.

8. Radialchoice entered into a Producer Agreement with Mathieson dated August 28, 1979.  That agreement stated that Mathieson's interests in the three sound recordings would vest in Radialchoice as its sole property.  It also required Radialchoice to pay Mathieson a non-returnable advance of $6,000, which it paid.

9. Mathieson did not testify at trial or supply any written testimony.  According to Lait, Mathieson's job was to:  (a) arrange and schedule meetings and recording sessions for the recording of the three songs; (b) ensure that musicians and vocalists appeared as required; (c) obtain the best possible performances from the vocalist and musicians; (d) provide creative input to the recording of the three songs; and (e) ensure that the sound recordings were technically satisfactory and commercially suitable.  Lait or his assistant occasionally saw Mathieson do some of these things in person.

10. After recording the first three songs, Radialchoice and Basil signed an agreement dated October 1, 1980.  The 1980 Agreement provided for the production of more sound recordings to be combined with the first

three recordings and then embodied on a long-playing record album that would eventually become the *Word of Mouth* album, as depicted in Figure 1 below.



*Figure 1* **(Jacket Cover, U.S. Version)**

The 1980 Agreement, like the 1979 Agreement, gave Radialchoice the right of final approval for the sound recordings to ensure that they were technically satisfactory and commercially suitable. All the DSRs are embodied on the *Word of Mouth* album.

  11. Radialchoice entered into a Supplemental Producer Agreement with Mathieson dated June 16, 1980. Mathieson had essentially the same responsibilities as under the 1979 Producer Agreement. The Supplemental

Producer Agreement, however, also required Mathieson to submit a written budget to Radialchoice for approval. Radialchoice would have paid what was approved in the budget. Radialchoice also paid Mathieson $12,000 in advances.

12. The composition of the song which became "Mickey" was derived from a composition entitled "Kitty." "Kitty" was one of many tapes of songs submitted to Radialchoice by music publishers and songwriters to be considered for inclusion on *Word of Mouth*. The tape for "Kitty" was sent by Radialchoice to Basil and ultimately it was selected and jointly approved by Radialchoice and Basil for inclusion on *Word of Mouth*. The remaining six songs for inclusion on the *Word of Mouth* album (as released in the United States) were picked jointly by Radialchoice and Basil.

13. Mathieson was the credited producer, along with Trevor Veitch, for the *Word of Mouth* album. Veitch did not testify at trial or supply any written testimony. Nor did Stillwater submit any evidence of a producer's agreement with Veitch, as it did for Mathieson.

14. According to Lait, Mathieson performed the responsibilities expected of producers in making sound recordings, including scheduling recording sessions and securing the attendance of the musicians, and he did it well. Lait or his assistant attended some recording sessions, at which Mathieson was seen providing direction to musicians, overseeing the recordings to obtain the best possible performances, and, most importantly, mixing the master tapes (24 or 48 tracks).

15. Basil helped Mathieson with the mixing of the master tapes.

16. The back of the album jacket to the *Word of Mouth* album credits several musicians who played instruments, keyboards, or synthesizers, or who provided backup and background vocals, all as

7

depicted below in Figure 2.



*Figure 2* (Rear Jacket Cover, U.S. Version)

None of these credited people testified at trial or supplied written testimony. All the credited musicians were, however, paid by Radialchoice. The album cover also lists Dorsey High Cheerleaders (Classes of '80/'81) who provided the "Stomping on 'Mickey.'" And it lists three people who supplied the back cover image, the cover photo, and the cover design.

8

17. The DSRs were recorded at Cherokee Studios in Los Angeles, California. Radialchoice paid the charges for the use of that studio. The DSRs were distributed in the United States by Chrysalis Records under an agreement with Radialchoice.

18. Radialchoice and Basil executed an agreement dated August 8, 1982. Under the 1982 Agreement, Radialchoice had the right to create and exploit derivatives of any of the DSRs without Basil's consent. Radialchoice produced the MSRs as derivative works under this 1982 Agreement before Basil's notice of termination. Basil's notice of termination thus describes the copyright in the MSRs as "a derivative copyright." Basil also admits in her answer that the MSRs are derivative works. (ECF 18, Ans. ¶ 13).

19. Copyright registrations were filed with the U.S. Copyright Office for "Mickey/Thief on the Loose," *Word of Mouth*, "Mickey (Spanish Version)/Thief on the Loose," and "Mickey Club Mix/Mickey" (Spanish Version). The listed "author" for each of the copyright registrations is Radialchoice, which is described on the forms as "employer for hire of Toni Basil."

20. In or around 1983, Radialchoice released a second album by Basil, the eponymously titled *Toni Basil*. This album was also distributed in the United States by Chrysalis Records. The second album generated little in the way of sales and was considered a commercial failure. Lait essentially blamed Basil for the commercial failure of this second album. So Radialchoice and Basil effectively, if not formally, ended their business relationship after the second album.

21. Stillwater presented no evidence of written agreements between or among Radialchoice, Simon Lait, Toni Basil, or any producers, musicians, or vocalists credited on the *Word of Mouth* album, which made

explicit that the DSRs were a joint work with more than one author for copyright purposes. Nor did Stillwater present any evidence of oral agreements making such an express statement about joint authorship of the DSRs.

22. Toni Basil says that she had no intent to be joint authors with anyone else when the DSRs were made. Stillwater does not dispute that Basil originated and developed the "cheerleading," "clapping," and "stomping" concepts used in the recording of "Mickey." Basil says that Mathieson was an inexperienced producer who at first did not fully understand or necessarily agree with the cheerleading concept for the song "Mickey." Basil considered herself the creator and "mastermind" of the DSRs, although she recognized that record companies, producers, and musicians would be needed to create the DSRs, like any sound recordings.

23. When the DSRs were made, Lait was unaware of any copyright concept involving "shared authorship" of a sound recording because to his knowledge there was "no such thing at the time."

## III.
## LEGAL CONCLUSIONS

1. In March 2013, Basil served a notice of termination under 17 U.S.C. § 203(a) for the DSRs and MSRs to reclaim the copyrights in those sound recordings that she had transferred between 1979 and 1982 to Radialchoice, Stillwater's predecessor-in-interest. As pertinent here, § 203(a) provides that an author's grant of copyright in her work to another may be terminated 35 years after the grant or first publication of the copyrighted work, whichever ends earlier, upon the service and filing of a proper notice. And § 203(b) provides that, on the effective date of termination under that notice, "all rights under th[e Copyright Act] that

were covered by the terminated grants revert to the author[.]" The effective date of termination here is June 11, 2016, and no one besides Basil has filed a notice under § 203(a) claiming reversion of the copyrights in the DSRs.

      2.     But § 203(b)(1) of the Copyright Act also provides that copyrights in derivative works are not subject to termination if they were created under the authority of an original grant before the termination notice. So, taking its two claims in reverse, Stillwater's second claim for declaratory relief for the MSRs is easily resolved in its favor. No one disputes that the MSRs were derived from the DSRs and created under a proper grant of authority before Basil filed her notice of termination. They are therefore "derivative works" whose copyright ownership does not revert to Basil under her § 203(a) notice. 17 U.S.C. § 203(b)(1). Stillwater retains copyright ownership of the MSRs.

      3.     Stillwater's first claim for declaratory relief, on the other hand, requires more analysis. That claim turns on whether Stillwater has proven that the DSRs are a "joint work" as defined by the Copyright Act. A joint work is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Absent a contract allocating ownership differently, the "authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). Stillwater claims that many coauthors— together with Basil—created the DSRs as a joint work, including Radialchoice, Mathieson, and each of the musicians listed on the back of the jacket cover for the *Word of Mouth* album. (*See* Figure 2 above).[4]

---

[4] Stillwater presented no testimony specific to Veitch's activities as an ostensibly credited producer, nor did it argue that Veitch should be considered a producer on par

4. "The statutory language [of § 101] establishes that for a work to be a 'joint work' there must be (1) a copyrightable work, (2) two or more 'authors,' and (3) the authors must intend their contributions be merged into inseparable or interdependent parts of a unitary whole." *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000). Everyone here agrees that the DSRs are a copyrightable work. And no one disputes that those involved in making the DSRs—including Radialchoice as the record company behind the *Word of Mouth* album—intended for their contributions, financial and artistic, to combine into a unitary whole consisting of the DSRs. The crux of the dispute, then, is whether there are two or more "authors" of the DSRs within the meaning of § 101.

5. Whether a "work is jointly authored under § 101" depends on several factors: (a) what "objective manifestations of a shared intent" to be coauthors existed; (b) how much each putative coauthor "superintended the work by exercising control"; and (c) if the "audience appeal of the work" stemmed from each coauthor's contribution in a way that "the share of each in its success cannot be appraised." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) (citing *Aalmuhammed*, 202 F.3d at 1234) (internal quotation marks omitted). In addition, "[a] 'joint work' in this circuit 'requires each author to make an independently copyrightable contribution' to the disputed work." *Aalmuhammed*, 202 F.3d at 1231 (quoting *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990)).

---

with Mathieson. In any case, the analysis below explaining why neither Mathieson nor the other credited musicians are joint authors applies equally to Veitch no matter his specific role.

6. That last requirement of "an independently copyrightable contribution" means that "an alleged agreement to collaborate combined with [a] noncopyrightable contribution" is not enough to meet the Ninth Circuit's "requirements for joint authorship." *Ashton-Tate*, 916 F.2d at 520-21.[5] Because of this requirement, Radialchoice cannot be an "author" for copyright purposes just because it was the record label that financed, approved, marketed, and distributed the DSRs. None of those music business activities—no matter how indispensable to the release and commercial success of the DSRs—is independently copyrightable. *See* 17 U.S.C. § 102(a), (b). Nor could any of Lait's direction, vision, or ideas have amounted to a copyrightable contribution since they were not "fixed" in a "tangible medium of expression." 17 U.S.C. § 101. "To be an author, one must supply more than mere direction or ideas." *S.O.S. Inc. v. Payday Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989). So when an alleged coauthor "contributes only ideas to the development of a work, whether or not it is a 'joint work,' without reducing those ideas to an expression, that author does not obtain an interest in the work." *Ashton-Tate Corp. v. Ross*, 728 F. Supp. 597, 601 (N.D. Cal. 1989), *aff'd*, 916 F.2d 516 (9th Cir. 1990).

7. This is not to say, of course, that record companies can never be "authors" of a copyrighted work. They can be, and very often are, through the work-for-hire doctrine. Under the Copyright Act, the author of a "work made for hire" is the "employer or other person for whom the work was prepared[.]" 17 U.S.C. § 201(b). That employer also owns the copyright

---

[5] This view is not universal but still shared by most federal courts. *See, e.g.*, *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1070 (7th Cir. 1994) (noting that majority of courts, including Ninth Circuit, reject view that anything more than de minimis contribution is enough for joint authorship and endorse instead view that a collaborative contribution must be independently copyrightable to produce a joint work).

unless a written signed agreement provides otherwise. *Id.* Indeed, "the work-made-for-hire doctrine govern[s] much of the big-budget Hollywood performance and production world." *Garcia v. Google, Inc.*, 786 F.3d 733, 743 (9th Cir. 2015) (en banc). That is why, for example, no one questioned that Warner Brothers was the "author" (and copyright owner) of the *Malcolm X* movie at issue in *Aalmuhammed* since the director Spike Lee had signed a contract creating that movie as a "work for hire." *See Aalmuhammed*, 202 F.3d at 1235.

8. Thus, the work-for-hire doctrine creates an exception to the rule that the "author" of a work is "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). But Stillwater has disavowed any claim that Basil recorded the DSRs as a "work for hire." (ECF 96 at 6-7; ECF 155 at 3). Without that kind of work-for-hire agreement, Radialchoice's contributions could not have made the company into an author under copyright law independent of the work of its agents, like Mathieson, who did make copyrightable contributions. *See Sys. XIX, Inc. v. Parker*, 30 F. Supp. 2d 1225, 1227 n.4 (N.D. Cal. 1998). So Mathieson's work as the hired music producer, not Radialchoice's business activities as the record label, is the relevant locus of authorship analysis.

9. "Merely making a copyrightable contribution is not enough to establish joint authorship, however." *Morrill v. Smashing Pumpkins*, 157 F. Supp. 2d 1120, 1123 (C.D. Cal. 2001). Stillwater must also prove that a music producer like Mathieson qualifies as an "author" under the three *Aalmuhammed* criteria. That is critical because "authorship is not the same thing as making a valuable and copyrightable contribution."

14

*Aalmuhammed*, 202 F.3d at 1232. "So many people might qualify as an 'author' if the question were limited to whether they made a substantial creative contribution." *Id*. at 1233. The test for joint work thus requires more than mere proof of a "creative contribution . . . to establish authorship." *Id*. Yet that is the most that Stillwater's evidence ultimately proves for its putative coauthors, including Mathieson.

   10. To start with, the first joint-author criterion is whether "putative coauthors ma[de] objective manifestations of a shared intent to be coauthors." *Aalmuhammed*, 202 F.3d at 1234. Of course, a "contract evidencing intent to be or not to be coauthors is dispositive." *Richlin*, 531 F.3d at 969. But Stillwater has presented no evidence of such a dispositive contract. "In the absence of a contract," the Court must "look to other objective evidence of intent." *Id*. Yet direct evidence of Mathieson's intent is effectively non-existent, as he neither testified nor provided any written testimony for Stillwater. On the other hand, Basil's testimony is that she had no intent to share authorship of the DSRs with Mathieson (or anyone else). Even discounting her testimony for bias, there is no other evidence in the record to reliably contradict Basil's account. If anything, Lait's testimony that the notion of "joint authors" never crossed his mind when he signed Basil as a recording artist for Radialchoice reinforces Basil's testimony. Thus, this first factor favors Basil.

   11. The second factor—whether Mathieson exercised enough creative control to be an author—is a closer call but still favors Basil in the end because Stillwater's evidence is too generic. Other than the existence of producer agreements and Lait's recollection that Mathieson executed the tasks expected of professional music producers, Stillwater offered no specifics to undermine Basil's more detailed testimony. For instance, she

testified about how she originated the "cheerleading" and "stomping" concepts for the song "Mickey," which Mathieson had no hand in. She also testified that Mathieson was an inexperienced producer at the time. She also testified to helping Mathieson mix the master tapes, which is perhaps the most significant creative mark that a music producer can leave on a sound recording independent of the performers. And Basil's claim to be the artistic "mastermind" behind the DSRs—while self-serving—is at least corroborated by the 1979 contract language that took the decision whether the original three songs she recorded met a satisfactory "artistic" standard out of Radialchoice's contractual control. Stillwater's scant evidence to the contrary, including Lait's second-hand recollection, is thus not enough to prove by a preponderance of the evidence that Mathieson "superintended" the creation of the DSRs as the "inventive" mastermind. *Aalmuhammed*, 202 F.3d at 1233-34. At most, this factor is neutral and does not tip in Stillwater's favor.

      12.    Recognizing the weakness of its evidence on this point, Stillwater asserts that Mathieson is legally presumed to be a joint author so long as his contribution was anything more than de minimis. (ECF 166 at 11-12). But copyright law (at least in the Ninth Circuit) creates no such presumption. "Recourse to a 'presumption' of joint authorship would prematurely short circuit the analysis the Ninth Circuit has mandated for the determination of whether a creative contributor is a joint author." *Creative Dream Prods., LLC v. Houston,* 2015 WL 12731915, at *5 (C.D. Cal. Apr. 2, 2015). True, legislative history behind the Copyright Act suggests that—in the mine run of sound recordings—both a producer and a performer are often considered coauthors of a joint work. *See* H.R. Rep. No. 94-1476, at 56 (1976). But that is a descriptive assumption of what

may be true for cases in the mean, not a legal presumption for all cases. "In the absence of a contract, the [joint work] inquiry must of necessity focus on the facts" of a given case and "cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much." *Aalmuhammed*, 202 F.3d at 1235. Stillwater's proposed theory creating a legal presumption of joint authorship for all music producers, based solely on the generic job description of what they do, would create the exact "rigid formula" that the Ninth Circuit has rejected for determining joint works.

   13. Finally, the third *Aalmuhammed* criterion tips in Basil's favor too. Stillwater's own evidence shows that the "audience appeal" of the DSRs was predicated more on Basil's performance than it was on Mathieson's production. Lait testified that he picked Basil as one of Radialchoice's first recording artists because she seemed to have the kind of unique audio-visual creativity he was searching for. No one testified that Mathieson had such a similarly unique talent. Lait also essentially laid the blame for the failure of the *Toni Basil* album on Basil herself; he gave no testimony suggesting that Mathieson was responsible, in whole or in part, for the commercial failure of that album. This suggests, just as common sense would confirm, that the relative success of the *Word of Mouth* album—like the commercial failure of the second album—could be, and was in fact, "appraised" based on how well Basil performed, not on Mathieson's mixing of master tapes.

   14. In sum, Stillwater's evidence as a whole failed to prove that either Radialchoice (as the record label) or Mathieson (as Radialchoice's hired producer) were coauthors of the DSRs under the Copyright Act. That leaves only the musicians credited on the back of the jacket cover for the *Word of Mouth* album. But none of these musicians testified or supplied

written testimony. Nor did Stillwater present any evidence—other than the jacket cover itself—to prove that these musicians should be found coauthors along with Basil. So there is no credibly reliable and persuasive evidence that these musicians exercised the requisite creative control, made contributions critical to the record's audience appeal, or shared an intent to be coauthors with Basil.

15. Moreover, just tallying up musicians listed on the jacket cover of a record album is "copyright cherry picking" in the extreme and, if allowed, "would enable any contributor from a costume designer down to an extra . . . to claim copyright in random bits and pieces of a unitary [work] without satisfying the requirements of the Copyright Act." *Garcia*, 786 F.3d at 737. If musicians credited on the back of a record jacket could, on that basis alone, become joint authors under the Copyright Act, it "would extend joint authorship to many 'overreaching contributors,' . . . and deny sole authors 'exclusive authorship status simply because another person render[ed] some form of assistance.'" *Aalmuhammed*, 202 F.3d at 1235 (quoting *Thomson v. Larson*, 147 F.3d 195, 200, 202 (2d Cir. 1998)).

16. To be sure, no one questions that the combined contributions of Radialchoice, Mathieson, and all the credited musicians were intended to be "merged into inseparable or interdependent parts of a unitary whole" that would become the DSRs. But that intent differs from—and must not be confused with—the separate "shared intent" to be joint authors within the meaning of the Copyright Act. *See Aalmuhammed*, 202 F.3d at 1231-32. In *Aalmuhammed*, for instance, it was "undisputed that the movie [*Malcolm X*] was intended by everyone involved with it to be a unitary whole," but that did not answer the "different" question whether those involved "intended each other to be joint authors." *Id.* at 1231-32, 1234.

Contributors can be authors of an "expression for purposes of determining whether it is independently copyrightable" without becoming "author[s] of [a] joint work within the meaning of 17 U.S.C. § 101." *Id.* at 1232. That is because, by itself, the "contribution of independently copyrightable material to a work intended to be an inseparable whole will not suffice to establish authorship of a joint work." *Id.* at 1233. So, in the absence of a contract, "a person claiming to be an author of a joint work must prove that both parties intended each other to be joint authors"—not just that they intended for their contributions to be merged into a unitary work. *Id.* at 1234. Stillwater's evidence focused almost exclusively on the latter undisputed point, not the former disputed point.

17.   In the end, Stillwater's evidence shows only that many artists and other music industry professionals, including a record label, contributed to the DSRs—with those like Radialchoice and Mathieson making indispensable and valuable contributions without which the DSRs would not have come into existence. But that undisputed reality is very distinct from whether all those parties mutually intended to be—and legally qualified as—coauthors of a "joint work" under § 101 of the Copyright Act. Stillwater's evidence on that key question was scant at best, insufficiently credible, and ultimately unpersuasive.

## IV.
## CONCLUSION

Based on these findings of fact and conclusions of law, judgment will be entered in favor of Basil on Stillwater's first claim for declaratory relief and in favor of Stillwater on its second claim for declaratory relief. Basil's motion for judgment on partial findings (ECF 160) is denied as moot. Her motion to strike Stillwater's post-trial submission (ECF 167) is also denied.

Within 14 calendar days of this order, the parties will file a stipulation and proposed scheduling order to adjudicate Basil's accounting counterclaim. That stipulation must include (1) a method to select a mutually-agreeable, court-appointed accounting expert to analyze Stillwater's relevant financial records concerning the DSRs, whose fees will be paid jointly 50-50 by the parties, and (2) a deadline for a settlement conference before a U.S. Magistrate Judge in Los Angeles, California, to be attended **in person** by both Stillwater's principal and Toni Basil along with their respective attorneys (unless the parties agree to settle before that deadline without court involvement).

**IT IS SO ORDERED.**

DATED: February 5, 2020

STEVE KIM
U.S. MAGISTRATE JUDGE